[Civ. No. 17582. First Dist., Div. Two. Jan. 20, 1958.]

ROBERT W. KING, Appellant, v. TILDEN PARK ESTATES (a Corporation) et al., Respondents.

*Assigned by Chairman of Judicial Council.

Byers, Howell & Fraser, Fred K. Howell, Jr., and Robert H. Kroninger for Appellant.

Tinning & DeLap, J. Vance Porlier and Francis A. Watson, Jr., for Respondents.

KAUFMAN, P. J.—This is an appeal from a judgment of nonsuit in favor of respondents. The motion for a nonsuit as to respondent Pringle-Hurd and Company, Inc., was granted at the conclusion of appellant's opening statement on the ground that the terms of the agreement were not determined

at the time the respondent agreed to pay the commission. The motion for a nonsuit as to respondents Gillett and Tilden Park Estates was granted at the close of appellant's case in chief on the ground that the alleged agreement violated the Statute of Frauds.

The amended complaint stated three alternative causes of action: the first on an oral broker's agreement for compensation for obtaining the assignment of a contract right to purchase real property; the second in *quantum meruit* for the reasonable value of the services rendered by the appellant to the respondents in the amount of $141,500; the third for the expenses incurred by the appellant in handling this transaction for the respondents in the amount of $8,500.

The facts as disclosed by the record are as follows: The plaintiff and appellant, Robert W. King, has been a licensed real estate broker in California since 1946. Early in 1951 appellant received a brochure from the East Bay Municipal Utility District stating that the 2,545-acre tract in Contra Costa County known as the Wildcat Canyon Area was for sale. In 1952 the district, by a written contract of sale, agreed to sell the property to Phillip Ross who was acting for a buying syndicate composed of Mr. Ross, Louis Navellier, Mr. Weingard, Arnold Moore and others.

Appellant contended that from May, 1953, until May, 1954, he had had an oral agreement with Mr. Ross to find a purchaser for all of Ross' interest in the Wildcat Canyon Area in return for a 10 per cent commission. Appellant testified that his oral agreement was made over the telephone with Mr. Navellier who represented Mr. Ross. Mr. Ross denied the existence of this agreement and stated that he met the appellant for the first time in December, 1953.

In April, 1954, Phillip Ross and his syndicate assigned all of their interest in the contract of sale with the Municipal Utility District to the defendant, Tilden Park Estates, a corporation formed for this purpose on May 3, 1954, with the defendant, Harry R. Gillett, as president. This transaction is the basis of this action.

With the help of Jeff Branscom, a business associate of the appellant, and the brother-in-law of respondent Gillett, the appellant on a vacation visit to Las Vegas in November, 1953, met Gillett in Las Vegas and discussed the purchase of the Wildcat Canyon property. On December 3, 1953, Gillett came to Berkeley to look at the property which was shown to him by one of the appellant's salesmen, as the appellant

was in the hospital. A week or so later Mr. Gillett again came to Berkeley to more extensively look at the property with the appellant and Mr. Navellier. About December 20, 1953, the appellant, Mr. Ross, and Mr. Navellier flew to Las Vegas for further negotiations relating to the price of the property. At that time the appellant discussed the matter of his commission privately with Mr. Gillett, $25,000 plus a 4 per cent override. In the latter part of December, 1953, the parties again met in Los Angeles, at which time the appellant again discussed the commission with Mr. Gillett on the same terms as before. The appellant testified that he next saw Mr. Gillett in Las Vegas in January, 1954, and at this time they discussed a commission of $25,000 flat payment, with an interest in the construction, real estate and insurance companies to be formed, but no definite terms were agreed upon. The appellant met Ross and Gillett again in the Bay Area in February, 1954.

On April 28, 1954, another meeting was held in Los Angeles with the above parties present as well as a representative of the respondents Pringle-Hurd, a New York corporation which was to finance the transaction.

Appellant testified that the conversations in regard to his commission at that time were as follows: "Mr. Ross said that —'You understand, Mr. Hurd and Mr. Gillett, that you are to pay Mr. King's commission,' and they understood. They replied that they understood that." At that meeting Mr. Hurd made a $25,000 deposit on the purchase price of the property. At this time no definite agreement pertaining to appellant's commission had been reached, except that the purchaser was to pay appellant's commission. It would appear then that until April 28, 1954, appellant was looking to Ross, the seller, to pay his commission.

On May 10 and 11 the appellant met Mr. Gillett and his associate, Mr. Charley Horsey, in Las Vegas, at which time they had the following conversation in regard to appellant's commission: "At that time we discussed the twenty-five thousand dollars—Mr. Horsey was present—the two per cent override—he said Pringle-Hurd wouldn't go for any more than that—and an interest in the insurance company to be formed, the real estate company to be formed, and the construction company to be formed. I asked him to put it in writing at that time, give me a memo on it, and I was making my notes, and both he and Mr. Horsey assured me that their word was good enough and it would be taken care of after we got back to the Bay Area and after the ratification of the

contract that had been drawn by their respective attorneys on ratification by the East Bay MUD.'' Appellant further testified that he relied on Gillett's word and that after this discussion Gillett stated he was going to send Pringle-Hurd a wire verifying the 2 per cent override, to which the appellant consented and that Gillett then asked him to find some customers for the property.

Appellant testified that after May 10, 1954, he showed the property to various contractors and other potential purchasers; he arranged for the site and remodelling of offices for Tilden Park Estates; he made speeches in front of various groups on behalf of the defendants, generally spending 90-95 per cent of his business time on these matters to the detriment of the rest of his real estate business.

Appellant admitted that he had never signed a written agreement for his commission with Gillett or Tilden Park Estates. The record shows that an agreement was prepared by the defendants and submitted to the appellant. After consulting his attorney, Mr. Gray, appellant rejected the above agreement and had Mr. Gray draft another agreement. This agreement, Plaintiff's Exhibit Number 7, varies materially from appellant's complaint and oral testimony in that it proposes a flat figure of $22,000 (instead of the $25,000 alleged) and a two per cent override and makes no mention of any interests in an insurance or construction company to be formed. This second agreement was forwarded to defendant's counsel, Mr. DeLap, who prepared and returned another draft to the appellant which the appellant never signed. Shortly thereafter all negotiations between the parties collapsed, and this action was filed.

Appellant contends on appeal that the trial court erred in granting the motion of nonsuit as to the defendants Harry Gillett and Tilden Park Estates. Appellant contends that the evidence discloses an oral broker's agreement for procuring the assignment of a contract right to purchase real property, which is not an interest in real property and therefore not violative of the statute of frauds; that this agreement is supported by adequate consideration as appellant gave up his rights under the oral agreement with Ross; that even if the statute of frauds is applicable, an estoppel operates in his favor because of the statements made by Mr. Gillett on May 10; that the agreement, even if illegal and in violation of the statute of frauds, was severable as to the provisions for the commission and the provisions for appellant's interest in

the various corporations to be formed for the development of the property. We see no merit in any of these contentions.

■ Viewing the evidence more favorably to the appellant, i.e., that it does show that an agreement was reached, we turn to appellant's first contention that the agreement is not an "agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission," within the language of Civil Code, section 1624, subdivision 5, and Code of Civil Procedure, section 1973, subdivision 5, because a contract right is not "real property." We think the agreement alleged by the appellant perfectly fits the language of the above statutes. In *Pacific etc. Dev. Corp.* v. *Western Pac. R. R. Co.*, 47 Cal.2d 62 [301 P.2d 825], appellant's point as to the nature of the interest was squarely refuted in the court's holding that the plaintiff, a licensed real estate broker, could not recover compensation for alleged services rendered in connection with defendant's procurement of an option to purchase real property, as the agreement was not in writing. ■ The court stated at 67 and 68: "In determining the nature of the services which will bring an employment contract within the statute, the phrase 'to sell or purchase' includes 'to aid or assist in the purchase or sale' of real estate. (*Hooper* v. *Mayfield,* 114 Cal.App.2d 802, 806 [251 P. 2d 330] ; *Duckworth* v. *Schumacher,* 135 Cal.App. 661, 666 [27 P.2d 919].) Such broad construction of the term conforms with one of the primary purposes of the statute, the protection of real estate owners from the assertion of false claims by brokers and agents. (*Toomy* v. *Dunphy,* 86 Cal. 639, 642 [25 P. 130] ; also *Gorham* v. *Heiman,* 90 Cal. 346, 358 [27 P. 289] ; *Hooper* v. *Mayfield, supra,* 114 Cal.App.2d 802, 807.) Likewise, the procurement of an option agreement for the purchase of real property is a contract that aids or assists in the purchase or sale of real property, and properly comes within the provisions of the statute. Accordingly, a contract employing a broker to obtain an option for the purchase of real property, like a contract employing a broker to purchase or sell real property (*Steiner* v. *Rowley,* 35 Cal.2d 713, 717 [221 P.2d 9] ; *Marks* v. *Walter G. McCarty Corp. supra* [33 Cal.2d 814 (205 P.2d 1025)]), comes within the statute and must be in writing. To hold otherwise would open the door to the assertion of unfounded claims by brokers and others on the pretense of oral employment in real estate transactions relative to options, and so frustrate the purpose of the statute. . . .

■ "The chief element required to be shown in writing is the fact of employment of the broker to act for the principal in the transaction. (9 Cal.Jur.2d § 40, p. 185; *Toomy v. Dunphy, supra,* 86 Cal. 639, 642 [25 P. 130]; *Hooper* v. *Mayfield, supra,* 114 Cal.App.2d 802, 807; *Moore* v. *Brogfeldt,* 96 Cal.App. 306, 309-310 [273 P. 1114].)" and at 70: "The fact that plaintiff rendered services and conducted unsuccessful negotiations with Lenfest does not constitute a change of position to plaintiff's detriment, nor does the fact that defendant refused to pay plaintiff a real estate commission upon an option which defendant later procured through direct negotiations with Lenfest constitute an unjust enrichment within the meaning of the estoppel doctrine. To hold otherwise, in the absence of any showing of fraud, would defeat the purpose of the statute of frauds in relation to real estate transactions. (*Hicks* v. *Post,* 154 Cal. 22, 28 [96 P. 878]; *Augustine* v. *Trucco,* 124 Cal.App.2d 229, 241-244 [268 P.2d 780]; *Hooper* v. *Mayfield, supra,* 114 Cal. App.2d 802, 809; *Colburn* v. *Sessin, supra,* 94 Cal.App.2d 4, 6 [209 P.2d 989].)" *Dabney* v. *Edwards,* 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822], cited by the appellant held only that a lease for a definite term of years is not real property under Civil Code, section 1624, subdivision 5, while a lease to continue so long as gas and oil are produced is real property within the above section. In *Belieu* v. *Power,* 54 Cal. App. 244 [201 P. 620], the court was faced with the entirely different question of whether a judgment lien attaches to the vendee's interest under a sales contract and based its holding on the different wording in the statutes relating to execution and those relating to judgment liens.

■ It has long been held in this state that a real estate broker is presumed to know that contracts for real estate commissions are invalid and unenforceable unless put in writing. (*Steiner* v. *Rowley,* 35 Cal.2d 713 [221 P.2d 9]; *Marks* v. *Walter G. McCarty Corp.,* 33 Cal.2d 814 [205 P.2d 1025]; *Kroger* v. *Baur,* 46 Cal.App.2d 801 [117 P.2d 50].) ■ The appellant here admitted that he had never signed an agreement with any of the respondents. He therefore assumed the risk of relying on oral promises and has no cause for complaint if his efforts go unrewarded. (*Augustine* v. *Trucco,* 124 Cal.App.2d 229 [268 P.2d 780].)

■ Nor, as pointed out in *Sweeley* v. *Gordon,* 47 Cal.App. 2d 381, at 383-384 [118 P.2d 14], can one in appellant's position invoke the equity powers of the court to urge that the judgment of nonsuit be reversed under the doctrine of

estoppel. The general rule as to estoppel to rely on the statute of frauds is stated in 12 California Jurisprudence, page 934, as follows: "§ 103. Circumstances Creating Estoppel in General. —Equity is bound by the statute of frauds, and, in general, will give relief against it only in two classes of cases; first, where to allow the statute to be set up would be to secure to the party relying upon it the fruits of actual fraud; and, second, where to allow the statute to be set up would place the party resisting it in an inequitable position, it appearing further that there is evidence just as good as a writing of the agreement between the parties. To create an estoppel to assert the statute, the party relying on it must be able to show clearly, not only the terms of the contract, but also such acts and conduct of the opposite party as amount to a representation that he will not avail himself of the statute to escape his agreement, and, further, that the party asserting the estoppel has, in reliance on such representation and in pursuance of the contract, so far altered his position as to incur an unjust and unconscionable injury and loss, if the statute be allowed to be set up. If no such loss or injury is shown the reason for the estoppel fails. Changes in the position of a party, not made as a necessary consequence of an oral contract within the statute, and not induced by or known to the opposite party when the contract was made, do not estop the latter from setting up the statute."

The facts alleged here do not contain the elements of estoppel. The facts do not establish appellant's reliance on the alleged agreement but only the usual conduct of real estate brokers in obtaining purchasers and operating under a nonexclusive listing agreement. Nor does it appear that the appellant was bound to perform the various services. He was acting as a mere volunteer.

*Le Blond* v. *Wolfe*, 83 Cal.App.2d 282 [188 P.2d 278], cited by the appellant, is easily distinguishable. In that case, the plaintiff real estate broker had a written contract obligating the seller to pay him a commission. The broker released the seller from this obligation in reliance on the oral promise of the defendant purchaser to pay the commission. The appellate court affirmed the judgment for the plaintiff, holding that the doctrine of estoppel applied as the plaintiff had immediately changed his position to his detriment by releasing the seller. In the instant case, the appellant alleged an oral agreement with the seller Ross (the existence of which Ross denied), which appellant allegedly gave up in return

for the respondent's oral promise. It is elementary that the giving up of an unenforceable right is not sufficient consideration for a new promise.

 Appellant's argument that the alleged agreement was severable was not raised below and cannot be urged for the first time on appeal. (*Estate of Raphael,* 115 Cal.App.2d 525 [252 P.2d 979].) Nor can the appellant enforce his second and third causes of action indirectly where the contract was unenforceable because of the statute of frauds. (*White* v. *Hirschman,* 54 Cal.App.2d 573 [129 P.2d 430]; *Ford* v. *Palisades Corp.,* 101 Cal.App.2d 491 [225 P.2d 545]; *Jamison* v. *Hyde,* 141 Cal. 109 [74 P. 695].)

As there is no legal or equitable basis for sustaining appellant's action, the trial court was correct in entering the judgment of nonsuit.

Judgment affirmed.

Dooling, J., and Draper, J., concurred.